# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles R. Norgle | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 1713 | **DATE** | 10/17/2001 |
| **CASE TITLE** | WILLIAM MANSON vs. GENERAL MOTORS CORPORATION | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Defendant's motion for summary judgment is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | number of notices | | Document Number |
|---|---|---|---|---|---|---|
| | No notices required. | | | | | |
| | Notices mailed by judge's staff. | | | | | |
| | Notified counsel by telephone. | | | OCT 19 2001 | | 39 |
| ✓ | Docketing to mail notices. | | | date docketed | | |
| ✓ | Mail AO 450 form. | | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | | |
| EF | courtroom deputy's initials | | | date mailed notice | | |
| | | Date/time received in central Clerk's Office | | mailing deputy initials | | |


IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM MANSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 00 C 1713 |
| vs. | ) | |
| | ) | HONORABLE CHARLES R. NORGLE |
| GENERAL MOTORS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## OPINION AND ORDER

CHARLES R. NORGLE, SR. District Judge

Before the court is Defendant's motion for summary judgment on Plaintiff's claims of employment discrimination. For the following reasons, the motion is granted.

## I.  BACKGROUND[1]

Plaintiff, William Manson, who is African-American, began working for Defendant General Motors Corporation ("GM") in 1970 as a welder in GM's Electro-Motive Division ("EMD"). Throughout the length of his employment, Manson claims that racial hostility existed at the EMD facility, taking the form of racial slurs and racist graffiti, including the logos of white supremacist groups, certain employees displaying nooses in their cars in EMD's parking lot, and an employee wearing swastika jewelry.

---

[1]The court takes the facts from the parties' Local Rule 56.1 statements and accompanying exhibits. Disputed facts are noted in the text.

In 1999, Manson worked in the utilities department of EMD as a maintenance mechanic. Between January and March of 1999, two to three times per week, Manson observed three co-workers "power walking" past him, giving him what he described as sharp and intimidating looks. Two of these co-workers are white, and the third is Hispanic. During this same time period, approximately three to four times per week, another white co-worker gave Manson intimidating looks near the time clock. The actions of the four co-workers were limited to what Manson perceived as sharp and intimidating looks. The co-workers did not speak to Manson or otherwise communicate with him.

Manson believes that the four co-workers were angry with him because they thought he was responsible for a "time study" being performed in EMD's truck shop, where the four worked. It is not entirely clear from the record, but it appears that Manson is not assigned to work in the truck shop area. In March of 1999, one of the co-workers purportedly said that the mechanics in the truck shop were angry about the time study, and that they were going to "get" Manson. Manson also believes that there is racial motivation for the alleged intimidation because he is African-American, and the four co-workers are either white or Hispanic.

On March 15, 1999, Manson became involved in a dispute with these four co-workers. Manson approached two of the co-workers and asked if they wanted to discuss the truck shop time study. The two co-workers purportedly "screamed" at Manson that they had nothing to discuss with him, and that he was "crazy." Manson then approached another one of the allegedly intimidating co-workers with the same question, and received the same response. The truck shop supervisor then ordered Manson to leave the truck shop area. Manson complied, but on his way out he spoke to the fourth co-worker, and may have pointed his finger at the co-worker.

Later in the day on March 15th, Manson's general supervisor approached him about the incident in the truck shop, and indicated that Manson was in trouble because his actions had caused a disturbance. Manson responded that there was a racial problem between him and the four co-workers, and that he wanted the four "evaluated." Also later the same day, Manson spoke with his union representative about the truck shop situation. The union representative spoke to the four co-workers, and then told Manson that the co-workers agreed to stay out of Manson's work area. At that time, the union representative did not speak to Manson's general supervisor.

The next day, March 16th, one of the co-workers entered Manson's work area and was "crouching," "carrying on," and making "frowning faces" at Manson for about thirty seconds. Manson reported this conduct to his union representative.

Also on March 16th, a group of employees from the truck shop went to their general supervisor and expressed concern about Manson. The truck shop general supervisor contacted Roger Kaspar, EMD's senior administrator for safety, industrial hygiene, and security. Kaspar met with the truck shop employees, and heard their concerns. At least one of the employees told Kaspar that Manson stated that he (Manson) was a private eye and was licensed to carry a gun. Kaspar concluded that Manson's conduct caused the truck shop employees to be concerned for their health and safety.

Kaspar then met with the truck shop supervisors, Manson's supervisors, and Manson's union representative to discuss the situation. All of the persons at this meeting were white. Manson's union representative stated that he felt Manson had done nothing wrong. Nevertheless, Kaspar suggested, and it was decided, that Manson should meet with the plant's physician, Dr. Lacey. Dr. Lacey, who is African-American, was contacted, and agreed that he should see Manson.

3

On March 17th, Manson's supervisor contacted him over a two-way radio, and ordered him to go to the medical department and meet with Dr. Lacey. At their meeting, Dr. Lacey asked Manson to discuss the truck shop incident. Manson replied that he did not wish to discuss anything with Dr. Lacy, and left the meeting. Dr. Lacey testified at his deposition that Manson was very angry and hostile towards him during this meeting.

After Manson's supervisor and union representative learned that Manson walked out of his appointment with Dr. Lacey, they went to Manson and told him that he was required to meet with Dr. Lacey, and that he faced discipline if he refused. Manson agreed to meet with Dr. Lacey, and met with him on the afternoon of March 17th. Manson explained to Dr. Lacey the treatment he had been receiving from his co-workers. Dr. Lacey testified that he was of the opinion that Manson exhibited some paranoia, but did not believe that Manson was a danger in the workplace. Nevertheless, Dr. Lacey told Manson that he was unable to reach a conclusion as to whether something was wrong with him, and that Manson would have to see outside doctors for further evaluation. Dr. Lacey then asked Manson to select a psychiatrist from a list of available doctors. Manson chose a doctor, and met with him on March 25th. That doctor, in turn, referred Manson to another psychiatrist for further evaluation, and Manson made that appointment on May 3, 1999. Throughout this time period, Manson continued to work and receive his normal pay and benefits.

On March 19, 1999, Manson filed a charge of discrimination with the EEOC, alleging: (1) he had been discriminated against because of his race in violation of Title VII of the Civil Rights Act ("Title VII"); and (2) that GM had violated the Americans with Disabilities Act ("ADA") by considering him to be disabled when it forced him to undergo a psychological evaluation.

4

At some point in 1999, the record is not clear as to exactly when, an unknown person or persons damaged two of Manson's vehicles while they were parked in EMD's employee lot. One vehicle's paint was scratched, and the other was dented in the rear end.

In November of 1999, GM announced an opening for the position of assistant chief operating engineer at EMD, which was a salaried position. Manson applied for the position both verbally and in writing. Mason's supervisor expected to interview Manson for the position, but was told by Paula McGhee, an African-American employee in EMD's personnel department, that hourly employees were not being promoted to salaried positions at that time. Ms. McGhee testified that the reason for this was to avoid having to replace hourly employees that were governed by a collective bargaining agreement. Manson never heard anything about his application for the position, which was eventually filled by a person that had not previously worked for GM.

On March 20, 2000, Manson filed this suit. He later filed an amended complaint, alleging that: (1) GM violated Title VII and the ADA by ordering him to undergo a psychological exam; (2) GM violated Title VII when it did not promote him in retaliation for his filing of the EEOC charge; and (3) GM subjected him to a hostile work environment in violation of 42 U.S.C. § 1981.

During discovery, the parties scheduled the deposition of an African-American co-worker of Manson's. This deponent testified that after his deposition was scheduled, several co-workers approached him about the deposition and encouraged him not to testify, or to testify "like a robot" by simply answering yes or no. The deponent testified that he felt intimidated by the "whole thing."

GM has moved for summary judgment. Manson's response to the motion differs from his complaint, in that he makes no mention of any claim under 42 U.S.C. § 1981, and he melds a hostile work environment claim together with a disparate treatment claim. As explained below, GM is

entitled to summary judgment because Manson does not have sufficient evidence to demonstrate his prima facie cases of discrimination under Title VII and the ADA.

## II.   DISCUSSION

### A.   Summary Judgment Standards:

Summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The nonmoving party cannot rest on the pleadings alone, but must identify specific facts, see Cornfield v. Consolidated High School District No. 230, 991 F.2d 1316, 1320 (7th Cir. 1993), that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. See Murphy v. ITT Technical Services, Inc., 176 F.3d 934, 936 (7th Cir. 1999); see also Shank v. William R. Hague, Inc., 192 F.3d 675, 682 (7th Cir. 1999) (stating that a party opposing summary judgment must present "what evidence it has that would convince a trier of fact to accept its version of events"). A defendant is entitled to put the plaintiff to his proofs and demand a showing of the evidence. See e.g. Navarro v. Fuji Heavy Industries. Ltd., 117 F.3d 1027, 1030 (7th Cir. 1997). If the plaintiff fails to come up with the required proof, the defendant is entitled to summary judgment. See id. It bears repeating that the plaintiff must present evidence, rather than speculation and conclusions without factual support. See Rand v. CF Industries, Inc., 42 F.3d 1139, 1146-47 (7th Cir. 1994).

In deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. See Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996). The court views the record and all reasonable inferences drawn therefrom in the light most favorable to the party opposing summary judgment. See Fed. R. Civ. P. 56(c), see also, Perdomo v. Browner, 67 F.3d 140, 144 (7th Cir.1995). "In the

light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962), see also, First Nat'l. Bank of Arizona v. Cities Service Co., 391 U.S. 253, 280 (1968); Wolf v. Buss (America) Inc., 77 F.3d 914, 922 (7th Cir. 1996). The choice between reasonable inferences from facts is a jury function. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

## B.   Title VII:

Manson alleges two types of discrimination arising under Title VII: (1) a hybrid disparate treatment/hostile work environment claim; and (2) retaliation. The court addresses each in turn.

### 1.   Disparate Treatment/Hostile Work Environment:

To prevail on a disparate treatment claim, Manson bears the ultimate burden of proving that GM intentionally took an adverse employment action against him because of his race. See Cianci v. Pettibone Corp., 152 F.3d 723, 726 (7th Cir. 1998). Manson can defeat summary judgment by presenting either direct evidence of discrimination, or indirectly through the burden shifting analysis of McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973). See De Luca v. Winer Indus., Inc., 53 F.3d 793, 797 (7th Cir. 1995); see also Robin v. Espo Eng'g Corp., 200 F.3d 1081, 1088 (7th Cir. 2000) (analyzing the McDonnell-Douglas test in an ADA/age discrimination case). Manson chooses to proceed under the indirect McDonnell-Douglas burden shifting approach. Therefore, Manson present factual evidence demonstrating that: (1) he is a member of a protected class; (2) he was meeting GM's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) GM treated more favorably similarly situated employees outside of the protected class. Robin, 200 F.3d at 1090. The parties dispute two elements of the prima facie case, whether Manson

suffered an adverse employment action, and whether GM treated other similarly situated non-African-Americans more favorably.

### a. Adverse Employment Action:

An adverse employment action is one that materially affects the terms and conditions of employment. See Rabinovitz v. Pena, 89 F.3d 482, 488 (7th Cir. 1996). A plaintiff can establish an adverse action with evidence of a termination, demotion, decrease in salary or benefits, or significantly diminished responsibilities. See id. (citing Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7th Cir. 1993)). The overriding emphasis is that the action must have a *materially* adverse effect on the conditions of employment. See Haugerud v. Amery School Dist., 259 F.3d 678, 690-91 (7th Cir. 2001) (emphasis added). Determining what is materially adverse normally depends on the facts of each case, and adverse actions can be both blatant and subtle. Id. at 690 (also noting that adverse employment actions consist of quantitative and/or qualitative changes in the terms and conditions of employment). But, however broad the field of adverse actions may be, "'not everything that makes an employee unhappy is an actionable adverse action.'" Id. (quoting Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996)). There must be some type of material change in the terms and conditions of employment.

Manson's primary claim of an adverse employment action is that he was subject to a hostile work environment at the hands of the four co-workers that he believed were trying to intimidate him. Manson, however, cites no authority for the proposition that a hostile work environment created by co-workers constitutes an adverse employment action that could give rise to employer liability under a disparate treatment theory. Cf. Grube v. Lau Indus., Inc., 257 F.3d 723, 729-30 (7th Cir. 2001) (rejecting the argument that a shift transfer and negative comments created a hostile work

environment that qualified as an adverse employment action); Sexton v. Runyon, No. 96 C 50233, 1997 WL 704910 at *4 (N.D. Ill. Nov. 10, 1997) (rejecting the proposition that a hostile work environment is per se an adverse employment action); compare Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257, 2268-70 (1998) (creating an affirmative defense for employers for Title VII liability, but only when the employee has not suffered a tangible employment action). Manson's position is at odds with the rule that an employer does not incur Title VII liability for co-worker harassment unless and until it negligently fails to correct the harassment. See Logan v. Kautex Textron North America, 259 F.3d 635, 641 (7th Cir. 2001); see also Frazier v. Delco Electronics Co., 263 F.3d 663, 666-68 (7th Cir. 2001) (noting that when an employee is aware of coworker harassment, the employee "must move promptly to alert the employer and the employer must move promptly to investigate and resolve the situation; but only when it becomes clear that the employer has failed to resolve it in a timely fashion does the statute of limitations begin to run.").

Manson's mixing of discrimination theories is awkward. Nevertheless, the court examines the record to determine if Manson has evidence that he was subject to a hostile working environment. In order to be actionable, a hostile work environment must be sufficiently severe or pervasive, so as to alter the conditions of employment. See Gleason v. Mesirow Financial, Inc., 118 F.3d 1134, 1143-44 (7th Cir. 1997) (citing cases). The conduct giving rise to the hostile work environment claim must be both objectively and subjectively offensive, so that the work environment is hostile or abusive. See Faragher v. City of Boca Raton, 524 U.S. 775, 118 S. Ct. 2275, 2283 (1998); Murray v. Chicago Transit Authority, 252 F.3d 880-888-89 (7th Cir. 2001). "'Whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances.'" Gleason, 118 F.3d at 1143-44 (quoting Harris v. Forklift Systems, Inc., 510 U.S. 295, 114 S. Ct. 367,

370-71 (1993)). The circumstances "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Gleason, 118 F.3d at 1143-44 (quoting Harris, 114 S. Ct. at 371). Under this standard, a single incident of severely offensive conduct is a violation of Title VII, as are repeated instances of less offensive conduct. See Smith v. Sheahan, 189 F.3d 529, 533-34 (7th Cir. 1999) (holding that a single severe incident of sex-based harassment was sufficient to state a Title VII claim); see also Ellerth, 118 S. Ct. at 2262-63 (outlining repeated instances of offensive conduct that was actionable as a hostile work environment).

It is important to remember that not all workplace unpleasantries give rise to liability under federal civil rights laws, which prohibit discrimination, but do not guarantee a perfect work environment. See Vore v. Indiana Bell Telephone Co., Inc., 32 F.3d 1161, 1162 (7th Cir. 1994). On several occasions, the Seventh Circuit has explained that a workplace must be "hellish" before it is actionable as a hostile environment. See Logan, 259 F.3d at 641 (quoting Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1013 (7th Cir. 1997) (in turn citing Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995)).

Manson claims that the hostile environment has existed since he began his employment at EMD in 1970, but his brief fails to provide any specifics of the allegedly long lived harassment on which he is basing his suit. Another wrinkle is that GM argues that the allegedly historical harassment is barred by Title VII's 300 day statute of limitations. The statute of limitations, in turn, is governed by GM's response or non-response to any report of harassment from Manson. See Frazier, 263 F.3d at 666-68 (holding that in a case of co-worker harassment, the employer's Title

VII violation does not occur until it fails to take reasonable steps to end the harassment). Because GM promptly responded to Manson's only report concerning the alleged harassment, it is not clear how GM has even violated Title VII, or if so, when the statute of limitations began to run.[2] See id.; Logan, 259 F.3d at 641. Manson does not address the limitations issue at all, and makes only cursory allegations of a chronically hostile environment before focusing on the incidents that occurred in 1999. Because of Manson's sparse treatment of the pre-1999 incidents, and the accompanying statute of limitations issue, the court will only address alleged harassment that arose in 1999. See Caisse Nationale De Credit v. CBI Indus., 90 F.3d 1264, 1270 (7th Cir. 1996) (noting that a party seeking to avoid summary judgment must "wheel out all its artillery" to defeat the motion); Navarro, 117 F.3d at 1030 (noting that summary judgment is an appropriate time for the defendant to demand a showing of the plaintiff's evidence); see also Cohen v. Bucci, 905 F.2d 1111, 1112 (7th Cir. 1990) ("In civil litigation we accept the issues framed by the parties.").

The incidents in 1999 fail to raise a triable question of fact as to whether Manson was subject to a hostile work environment. Again, these incidents are: (1) three co-workers "power walking" past Manson, and giving him sharp and intimidating looks, two to three times per week; (2) another co-worker giving Manson intimidating looks near the time clock three to four times per week; (3) that same co-worker harassing Manson the day after the truck shop confrontation; and (4) the damage to his cars.

To begin, Manson's four co-workers did not speak to him, nor did they touch him, or engage in any behavior that was threatening to Manson. At most, the co-workers glared at Manson, but

---

[2]The parties do not analyze the issue in this manner, so the court does not address it further. See Cohen, 905 F.2d at 1112.

there is no other evidence of threats against Manson to place these glares into the type of context necessary to support a hostile environment claim. See Frazier, 263 F.3d at 668 (noting that evidence of some type of threat is necessary to place glares or dirty looks in context). There is also nothing humiliating about the co-workers' acts, nor is there evidence that the co-workers interfered with Manson's ability to perform his job. Compare Daniels v. Essex Group, Inc., 937 F.2d 1264, 1269-76 (7th Cir. 1991) (describing an actionable racial hostile work environment that caused the plaintiff to leave his job, which included a hanging effigy, racist graffiti directed to the plaintiff that included death threats, and a bullet fired into the plaintiff's home).

Moreover, there is no evidence that the actions of Manson's four co-workers were motivated by race. See Hardin v. S.C. Johnson & Son, Inc., 167 F.3d 340, 345 (7th Cir. 1999) (noting that the complained of conduct must have a racial purpose to be a violation of Title VII); Vore, 32 F.3d at 1162 (affirming grant of summary judgment in favor of Title VII defendant where there was no evidence of a hostile work environment based on racial animus). Manson presents no evidence of a racial animus on the part of the co-workers. Instead, he simply concludes that there must be racial motivation because he is African-American, and the co-workers are either white or Hispanic. Moreover, Manson admits that the co-workers were angry with him because of an unfounded belief that Manson was responsible for the truck shop time study. In this same vein, there is no evidence that the damage to Manson's cars was racially motivated, or even the identity or race of the actors. Title VII requires evidence of a connection between the alleged harassing conduct and Manson's race. GM is entitled to summary judgment absent such evidence.

Manson argues that the alleged attempted intimidation of an African-American co-worker prior to his deposition is further evidence of a hostile work environment. This does not help

Manson's case, primarily because these acts were not directed at Manson, but to a non-party to the suit. And, there is no evidence that the statements directed to the co-worker/deponent were racial in nature or racially motivated.

Manson also submits a smattering of other events that he claims are adverse employment actions, such as being ordered to undergo psychological testing, not being allowed to testify before a committee on workplace violence, being assigned to dangerous job assignments, not receiving overtime hours, and being singled out for enforcement of the 20 minute lunch break rule. None of these happenings rises to the level of an adverse employment action. First, GM was well within its rights to order a psychological evaluation of Manson in light of his ongoing dispute with the four co-workers. See e.g. Merheb v. Illinois State Toll Hwy. Auth., – F.3d –, No. 00-2547, 2001 WL 1159807 at *2-4 (7th Cir. Oct 3, 2001) (discussing an employer's duty to respond to threats of workplace violence). GM faced a situation of noticeable tension between Manson and the four co-workers, and dealt with it promptly. Manson's co-workers voiced concerns about his behavior, and told supervisors that he had mentioned he was licensed to carry a gun. Whether those facts are true or not is irrelevant to GM's liability for racial discrimination - the point is that GM had an obligation to respond to the situation. See Merheb, 2001 WL 1159807 at *2-4. There is no evidence that GM's motivation for sending Manson for a psychological evaluation was racially motivated.

Second, Manson fails to present admissible evidence to support his assertion that he received dangerous job assignments. Manson's proffer is limited to the deposition testimony of a co-worker, who admitted that he did not have personal knowledge of the facts. Instead, the co-worker testified that Manson was the source of the dangerous job assignment information. This testimony is hearsay based on the self serving conclusion of Manson, and is insufficient to defeat summary judgment.

13

<u>See</u> <u>Rand,</u> 42 F.3d at 1146-47 (noting that speculations and conclusions without factual support do not defeat summary judgment).

Next, Manson alleges that he was denied the opportunity to testify personally before a committee on workplace violence. Assuming this is true, it is not evidence of a materially adverse change in the terms and conditions of employment. <u>See</u> <u>Haugerud,</u> 259 F.3d at 690-91; <u>Rabinovitz,</u> 89 F.3d at 488. Again, GM had to deal with a situation of potential workplace violence, and did so. Manson does not like the outcome of GM's response, but the court will not second guess GM's actions in this situation. <u>See</u> <u>McCoy v. WGN Continental Broad. Co.,</u> 957 F.2d 368, 373 (7th Cir.1992) (noting that federal courts do not "sit as a super-personnel department that re-examines an entity's business decisions."); <u>see</u> <u>also</u> <u>Vore,</u> 32 F.3d at 1162 (noting that federal laws prohibit discrimination in the workplace, but do not guarantee a utopian workplace).

Finally, Manson's last two assertions, that he was denied overtime hours and that GM was selectively enforcing the 20 minute lunch break against him, are without merit. Manson admitted in his deposition that he was not sure that the denial of overtime hours was racially motivated, and that the alleged selective enforcement of a short lunch period was not a basis for this suit. These admissions doom any allegation that these events can be considered adverse employment actions.

In sum, none of Manson's allegations of an adverse employment action have merit. Thus, this element of his prima facie case fails, and GM is entitled to summary judgment on the disparate treatment/hostile work environment claim.

### b.    Other Similarly Situated Employees:

GM is also entitled to summary judgment because of Manson's failure to present evidence of similarly situated employees being treated differently than him. Manson's evidence on this point

is nearly identical to his claims of adverse employment action/hostile work environment, and is limited to a single paragraph of his response brief. Manson submits that:(1) the four co-workers he confronted on March 15, 1999 were not African-American, and were not subjected to psychological testing; (2) he was denied the opportunity to testify personally before a committee on workplace violence; (3) he was assigned to dangerous job assignments; (4) he did not receive overtime hours; and (5) he was singled out for enforcement of the 20 minute lunch break rule. These claims are without merit for the reasons discussed in the court's analysis of the purported adverse employment actions, which need not be repeated here. The court does add, however, that there is no basis for Manson's assertion that GM exhibits racial prejudice by ordering psychological counseling of African-Americans. GM alleges, and Manson admits, that of the eight EMD employees has sent to outside medical doctors for psychological evaluations, five were white and three were African-American. Manson has no basis to allege that GM ordered him to undergo a psychological evaluation because of his race.

## 2. Retaliation:

Likewise, Manson's retaliation claim fails because he does not have a prima facie case. A retaliation exists when: (1) the employee engaged in statutorily protected expression; (2) the employee suffered an adverse action by the employer, and (3) there is a causal link between the protected expression and the adverse action. See Rabinovitz, 89 F.3d at 488. The parties agree that Manson engaged in statutorily protected expression when he filed his EEOC charge in March of 1999, and that he suffered an adverse employment action when he was not promoted in November of 1999. The dispute is whether there is a causal link between the two.

15

To satisfy the causal link, Manson must demonstrate that the adverse action is "not wholly unrelated" to the protected activity. See Hunt-Golliday v. Metropolitan Water, 104 F.3d 1004, 1014 (7th Cir. 1997); see also McKenzie v. Illinois Dept. of Trans., 92 F.3d 473, 483 (7th Cir. 1996) (holding that the plaintiff must establish that the adverse action would not have occurred "but for" the protected speech). A close temporal link, in which the adverse employment action comes close on the heels of the protected speech can establish causation. See Sweeny v. West, 149 F.3d 550, 557 (7th Cir. 1998) (noting that an adverse action occurring one day or one week after the protected speech would establish the required nexus). But when there is a significant gap in timing, the plaintiff must present additional evidence of causation. See McKenzie, 92 F.3d at 485; see also Pierce v. Martin, No. 96 C 4046, 1997 WL 802104 at *7 (N.D. Ill. December 30, 1997) (and cases cited therein). The additional evidence can be found if the plaintiff presents evidence demonstrating a pattern of criticism and animosity by supervisors following the protected speech. See Hunt-Golliday, 104 F.3d at 1014.

GM asserts that the reason Manson did not receive the promotion is because he is an hourly employee, the position he applied for was a salaried position, and that GM was not promoting any hourly employees to salaried positions at the time in question. This policy stems from GM trying to avoid replacing hourly employees that left the collective bargaining unit. Manson offers nothing to counter this fact other than his own self serving post-deposition affidavit stating that two hourly employees were promoted to salaried positions approximately one year after Manson was not promoted. The affidavit does not state how Manson came to know these facts, and fails to specify how they are at all relevant to his non-promotion.

Moreover, Manson admits that the EMD's personnel staff in charge of implementing this policy had no knowledge of Manson's EEOC charge. Manson presents no factual basis for a jury to infer that GM's decision not to promote him was based on his filing of the EEOC charge.

Finally, Manson's EEOC charge predates his promotion application by at least eight months. This long delay weakens any inference that GM's failure to promote Manson was caused by his EEOC charge to the point that he must present additional evidence of causation for the claim to survive. See McKenzie, 92 F.3d at 485. Manson fails to present any such evidence. GM is entitled to summary judgment on this point.

## C. ADA Claims:

Next, Manson claims that GM violated the ADA, but, as will be seen below, not even Manson is clear as to how GM did so. The ADA prohibits discrimination against "a qualified individual with a disability because of the disability...." 42 U.S.C. § 12112(a). To demonstrate a prima facie case of ADA discrimination, Manson must establish three elements: (1) that he is disabled within the meaning of the ADA; (2) he is qualified to perform the essential functions of his job; and (3) he suffered an adverse employment action because of his disability. Pugh v. City of Attica, Ind., 259 F.3d 619, 626 (7th Cir. 2001); see also Spath v. Hayes Wheels Int'l-Indiana, Inc., 211 F.3d 392, 396 (7th Cir. 2000) (describing a four element prima facie case for disparate treatment under the ADA: (1) the plaintiff is disabled within the meaning of the ADA; (2) the plaintiff's work performance meets the employer's legitimate expectations; (3) the plaintiff suffered an adverse employment action; and (4) the circumstances indicate that it is more likely than not that the plaintiff's disability was the reason for the adverse employment action). The issue here is whether Manson is disabled.

The ADA defines a disability as a physical or mental impairment that substantially limits a major life activity, a record of such impairment, or being regarded as having such an impairment. See Krocka v. City of Chicago, 203 F.3d 507, 512 (7th Cir. 2000) (quoting 42 U.S.C. § 12102(2)). Not every physical or mental impairment rises to the level of a disability. The ADA plaintiff must also demonstrate that the impairment substantially limits a major life activity. See Krocka, 203 F.3d at 512; Duncan v. State of Wisconsin, 166 F.3d 930, 935 (7th Cir. 1999). The Seventh Circuit has construed "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." DePaoli v. Abbot Labs., 140 F.3d 668, 671 (7th Cir.1998) (citing 29 C.F.R. § 1630.2(h)). Because Manson is alleging that GM regarded him as disabled, he must demonstrate both that GM regarded him as having a physical or mental impairment, and GM regarded the impairment as substantially limiting one of his major life activities. See Krocka, 203 F.3d at 512-15.

Manson's complaint states that GM violated the ADA by ordering him to undergo psychiatric evaluations, but he does not take that position in response to the summary judgment motion. Therefore, Manson has forfeited the argument. See Doe, By and Through G.S. v. Johnson, 52 F.3d 1448, 1457 (7th Cir. 1995) ("A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority, forfeits the point."); see also Shank, 192 F.3d at 682 (holding that a party opposing summary judgment must present its evidence); Navarro, 117 F.3d at 1030 (noting that a defendant is entitled to put the plaintiff to his proofs); cf. Sanders v. Venture Stores, Inc., 56 F.3d 771, 774 (7th Cir. 1995) (in a different context noting that there must be a point where a plaintiff commits to the theory of the case) (quoting Johnson v. Methodist Med. Ctr. of Ill., 10 F.3d 1300, 1304 (7th Cir. 1993)). Even if Manson had

made the argument, it would fail, because an employer is entitled to inquire into the mental health of an employee when there are concerns about employee or public safety. See Krocka, 203 F.3d at 515; see also Davis-Durnil v. Village of Carpentersville, 128 F. Supp. 2d 575, 580-81 (N.D. Ill. 2001) (chambers opinion, collecting authority); cf. Merheb, 2001 WL 1159807 at *2-4 (discussing an employer's duty to respond to threats of workplace violence). In this case, several employees voiced concern over Manson's actions on March 16th, when he confronted co-workers in the truck shop. This incident prompted a meeting of several supervisors, Manson's union representative, and EMD's senior administrator for safety, industrial hygiene, and security. These persons discussed the situation and agreed that Manson should see EMD's doctor. Manson was allowed to remain on the job, and did not suffer any tangible effect as a result of seeing the doctors. On these facts, GM cannot incur ADA liability for simply ordering Manson to see a physician. See Krocka, 203 F.3d at 515; see also Davis-Durnil, 128 F. Supp. 2d at 580-81 (and cases cited therein); cf. Merheb, 2001 WL 1159807 at *2-4.

Manson's opposition to the summary judgment motion is limited to Dr. Lacey's belief that Manson suffered from paranoia, statements from co-workers that Manson was "crazy," and an assertion that GM routinely denied Manson's overtime requests while granting overtime to other employees. This evidence fails to raise a triable question of fact as to whether GM regarded Manson as having a mental impairment that substantially limited him in a major life activity. See Krocka, 203 F.3d at 512; Duncan, 166 F.3d at 935. Dr. Lacey's subjective belief of Manson's paranoia and the statements of Manson's co-workers in no way evidence a misperception on the part of GM that Manson was limited in a major life activity. These two bits of evidence do nothing to further

19

Manson's ADA claim. The only piece of evidence that requires more analysis is that GM denied Manson overtime hours.

Liberally construed, Manson's denial of overtime argument appears to be an assertion that GM regarded him as substantially limited in the major life activity of working. Manson does not articulate the argument in this manner, indeed, he presents very little in response to GM's motion on this point. Nevertheless, the court liberally construes his response as an attempt to argue that GM regarded him as unable to work. But to succeed under the ADA, Manson must demonstrate that GM regarded him as substantially limited in his ability to perform a broad range of jobs, not just a particular job, or a limited aspect of his job, such as the ability to work overtime. See Krocka, 203 F.3d at 513 & 514. There is no evidence that GM so perceived Manson. Manson stayed on the job, working his normal duties and his normal hours, without interruption. Moreover, Manson admits that he received no complaints from GM about his job performance. Manson presents nothing from which a jury could infer that GM regarded him as unable to work at his job, much less a broad range of jobs. Thus, Manson's ADA claim fails.

Note that the above analysis focuses on *working*, not *working overtime*. The Seventh Circuit has not held that working overtime is a major life activity, and Manson points to no authority to support that proposition. Indeed, the law is the opposite, that working as a major life activity must be analyzed generally over a broad range of jobs, instead of focusing on particular aspects of a job, such as working overtime. See Kolpas v. G.D. Searle & Co., 959 F. Supp. 525, 529-30 (N.D. Ill. 1997) (noting that the analysis of work as a major life activity must focus on the person's general capability to function in the work force, rather than on the ability to work more than forty hours per week); see also Multher v. Ann Arbor Machine, Inc., 18 F. Supp. 2d 722, 727-28 (E.D. Mich. 1998)

(collecting authority and holding that an inability to work overtime is not a disability within the scope of the ADA). Thus, GM cannot incur ADA liability for refusing to grant Manson overtime, even if GM's refusal was based on the perception (or misperception) that Manson had a physical or mental impairment. See Multher, 18 F. Supp. 2d at 727-28; Kolpas, 959 F. Supp. at 529-30; cf. Frazier, 263 F.3d at 668-69 (noting that an ADA plaintiff's inability to work in proximity to a co-worker that was harassing her was not a major life activity).

### III. CONCLUSION

For the foregoing reasons, the court grants summary judgment in favor of the Defendant. Case terminated.

IT IS SO ORDERED.

ENTER: _Charles R. Norgle, Sr._

CHARLES RONALD NORGLE, SR. Judge
United States District Court

DATED: _10-17-01_